ORIGINAL

FILED

NOV 2 1 2013

U.S. COURT OF
FEDERAL CLAIMS

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ALTA WIND II OWNER )
    LESSOR A, )
ALTA WIND II OWNER )
    LESSOR B, )
ALTA WIND II OWNER )
    LESSOR C, )
ALTA WIND II OWNER )
    LESSOR D, and )
ALTA WIND II OWNER )
    LESSOR E, )
          Plaintiffs, )
           ) No. _____  13-917 C
   v. )
           )
           )
THE UNITED STATES OF )
AMERICA, )
         Defendant. )

## COMPLAINT

## I.    INTRODUCTION.

1.    For over fifty years, the United States has used tax credits to promote investment in specific industries and activities.  One common form of tax credit is the investment tax credit ("ITC").  An ITC provides a dollar for dollar reduction in income taxes otherwise owed by a taxpayer, and thus constitutes a powerful financial incentive for taxpayers to make capital investments in those industries and activities.  Treasury has interpreted and applied ITC rules through numerous

decisions, regulations and published guidance. The courts have also interpreted and applied ITC requirements.

2.     In 2009, Congress decided to extend ITC treatment to wind power facilities, thus using this powerful tax credit to encourage the significant capital investments required for the upfront purchase and installation of wind facilities.

3.     Following the financial crisis of 2008, Congress also enacted Section 1603 of the American Recovery and Reinvestment Act of 2009. Recognizing that ITCs had limited value given the impact of the financial downturn on tax equity markets, Congress established in Section 1603 a cash grant program for wind energy facilities and other renewable energy projects, which Congress intended to "mimic" the established rules for ITCs. Through Section 1603, Congress sought to preserve and create jobs, boost investments needed to increase economic efficiency, provide long-term economic benefits, and limit the environmental consequences, including climate change, of greenhouse gas emissions.

4.     The Office of the Fiscal Assistant Secretary to the U.S. Department of Treasury ("Treasury") was charged with making cash grant payments to applicants under Section 1603. This Complaint arises out of Treasury's failure to comply with Congress's express instructions for calculating and making those payments.

5.     In Section 1603, Congress did not create a new administrative program. Congress did not set forth new criteria for the receipt of payments.

Congress did not authorize rulemaking. Instead, Congress mandated that Treasury make payments based on well-known tax concepts that applied to ITCs under Internal Revenue Code Section 48. Treasury did not adhere to Section 1603. Treasury instead developed its own ad hoc means of calculating cash grants, in disregard of established principles of tax law and the plain language of Section 1603.

6.     In particular, and as set out in greater detail below, Treasury violated Section 1603 by rejecting Plaintiffs' cash grant applications that were based on the established appraisal methods for ITCs. Treasury substituted its own greatly reduced valuation, arrived at through the disregard or misapplication of established rules for determining value for the purpose of ITCs. Moreover, Treasury refused to revise its conclusion, even in the face of clear evidence that its own valuation methods did not comply with the rules for ITCs that Congress instructed Treasury to follow in administering cash grants.

7.     As a result, Treasury has failed to pay Plaintiffs cash grants in the amounts to which they are entitled under Section 1603, thereby materially frustrating congressional intent. Plaintiffs over a period of two years engaged in discussions and correspondence with Treasury in an unsuccessful effort to induce the agency to comply with Section 1603. The only means of redress that Plaintiffs now have is to bring this lawsuit.

II.    **JURISDICTION.**

8.    This Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491, because Section 1603 is a money-mandating statute that requires reimbursements be made to "each person who places in service specified energy property." This Court has previously held that Section 1603 is a money-mandating statute giving rise to jurisdiction in this Court. *ARRA Energy Co. I v. United States*, 97 Fed. Cl. 12, 21 (2011).

III.    **PARTIES.**

9.    Non-party Terra-Gen Power, LLC ("Terra-Gen") is a national leader in renewable energy, developing, owning, and operating utility scale wind, geothermal, and solar generating facilities across six states and 26 projects. Terra-Gen is one of the largest renewable energy businesses in the United States, and it continues to expand operations in renewable energy. Through subsidiaries, Terra-Gen developed the Alta Wind II ("Alta II") wind energy facility, located in California, and currently runs Alta II.

10.    Plaintiff Alta Wind II Owner Lessor A ("Owner Lessor A") is a Delaware Statutory Trust that acquired a 25% undivided interest in Alta II and applied for a cash grant pursuant to Section 1603.

4

11.    Plaintiff Alta Wind II Owner Lessor B ("Owner Lessor B") is a Delaware Statutory Trust that acquired a 25% undivided interest in Alta II and applied for a cash grant pursuant to Section 1603.

12.    Plaintiff Alta Wind II Owner Lessor C ("Owner Lessor C") is a Delaware Statutory Trust that acquired a 20% undivided interest in Alta II and applied for a cash grant pursuant to Section 1603.

13.    Plaintiff Alta Wind II Owner Lessor D ("Owner Lessor D") is a Delaware Statutory Trust that acquired a 15% undivided interest in Alta II and applied for a cash grant pursuant to Section 1603.

14.    Plaintiff Alta Wind II Owner Lessor E ("Owner Lessor E") is a Delaware Statutory Trust that acquired a 15% undivided interest in Alta II and applied for a cash grant pursuant to Section 1603.

15.    Defendant is the United States of America, acting by and through its agency, the Department of Treasury ("Treasury").  Treasury is an Executive Agency of the United States government, charged with administering the Section 1603 cash grant program.  Responsibility for that administration was delegated to the Office of the Fiscal Assistant Secretary.

IV.   **CONGRESS'S EFFORTS TO FOSTER THE DEVELOPMENT OF AND INVESTMENT IN WIND ENERGY.**

A.   **Congress's Authorization of Investment Tax Credits for Wind Projects.**

16.   Since 1962, the United States has used the ITC to promote capital investment in targeted industries and activities.  An investment tax credit provides a dollar for dollar reduction in income taxes otherwise owed by a taxpayer.  The ITC thus constitutes a powerful financial incentive for taxpayers to make capital investments in those targeted industries and activities.

17.   Congress has made ITCs available to encourage investment in a wide variety of areas, including ethanol, biodiesel, research and development, enhanced oil recovery, low-income housing, the renovation of historic buildings, cogeneration facilities, nuclear power plants, projects using advanced coal technologies, projects in low-income areas, new hires, small employer pension plan startups, employer-provided child care, orphan drugs for rare diseases, and railroad track maintenance.  Targeted industries have included aviation and public transportation, as well as energy.

18.   An ITC is typically calculated as a specified percentage of the investment property's "cost basis."  Over the years, a substantial body of rules and law has developed concerning the ITC, including how to determine the "cost basis" of the investment.

19.   Congress has included wind energy among the activities and industries it promotes through tax benefits, including ITCs.  Those benefits are an important motivating force behind the development of the industry.

20.   Congress first used tax credits to promote wind energy in the Energy Policy Act of 1992, Pub. L. No. 102-486, § 1914(a).  That Act provided for *production* tax credits, with the amount of the credit based upon the amount of wind energy produced by a particular facility.

21.   In the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, § 1102(a) (the "Recovery Act"), Congress increased its wind promotion efforts, by adding wind energy facilities to the kinds of renewable energy facilities (such as solar) that were already eligible for an ITC, under Section 48 of the Internal Revenue Code, 26 U.S.C. § 48(a)(5).  Congress thereby recognized the importance of the development of wind energy facilities for the nation's renewable energy future.

22.   Congress set the ITC for wind energy facilities at 30% of cost basis, meaning that, for example, a wind energy facility with a $100 million cost basis, placed in service during a given taxable year, would generate a $30 million credit against taxes otherwise owed in that taxable year, in addition to other federal tax benefits such as depreciation, and the financial benefits derived from the electricity generated. *See* 26 U.S.C. § 48.

23.   An ITC, by definition, is of economic value only insofar as it can be applied against income taxes otherwise owed by the taxpayer.   A given wind energy developer may not have sufficient tax liabilities itself to make use of an ITC.  In addition, the investment required to develop and run a wind energy facility is substantial, often in the hundreds of millions of dollars, and wind energy developers routinely need to raise capital from third parties to support projects.

24.   Thus, wind energy developers typically seek the involvement of well-funded third parties that have the necessary capital and can take advantage of the ITC and other available tax benefits.   Consistent with longstanding practice and precedent, along with express rulings, bulletins, and other authority from the Internal Revenue Service, wind developers contract with such third parties for this purpose, through various arrangements such as the "sale-leaseback."  This is a common practice for many capital-intensive industries.   For example, the sale-leaseback has been used for decades by airlines, railroads, ship and trucking companies, oil and gas companies, utilities, mining, and telephone companies to finance equipment.

25.   As relevant here, and oversimplifying for illustrative purposes, under a sale-leaseback, Company A, often using borrowed funds, develops and supervises the construction of a wind energy facility.  Company A then sells the facility to Company B for a price negotiated between them at arms-length and

almost always supported by an independent appraisal.  Company B then leases the property back to Company A, which pays initial and periodic rents to Company B for a specified number of years.  Company A pays those rents in part from the income it receives from operating the wind energy facility and selling the energy produced.  Depending upon the negotiated arrangement, Company A may have the right at the end of the lease term to buy the facility from Company B.

26.    Thus, Company A has through the sale leaseback financed the facility through the sale of the facility to the lessor (Company B) at fair market value, and Company A will then lease and operate the facility and receive the income produced.  Company B has paid the fair market value for the facility and in return obtained the right to the applicable tax benefits and the contractual right to lease payments, which combined will over time provide an appropriate return on the investment Company B made to buy the facility.

27.    As the owner of the property, Company B will, applying relevant principles and precedent, determine its cost basis in the facility, upon which the 30% ITC is calculated, and claim a credit in this amount on its tax return.  The Internal Revenue Service can subsequently determine whether to audit the return, and if so, challenge the claimed cost basis and resulting credit.

### B.     The Section 1603 Cash Grant Program.

28.    In 2008, a sharp economic downturn hit the entire U.S. economy. Investors that faced losses, or significantly reduced profits, had relatively little use for ITCs, given that ITCs are of value only if one has income tax obligations that the ITC will reduce.   The demand for ITCs largely collapsed.   Under those conditions, investor participation in ITC projects, including renewable energy projects, was in jeopardy.

29.    Congress responded in February 2009 through the Recovery Act. The stated purposes of the Recovery Act included the preservation and creation of jobs to promote economic recovery, assistance to those most impacted by the recession, and the provision and promotion of investment in transportation, environmental protection and other infrastructure to increase economic efficiency and provide long-term economic benefits.

30.    Section 1603 of the Recovery Act, titled "Grants For Specified Energy Property In Lieu of Tax Credits," addressed the lack of demand for ITCs by creating a temporary program[1] under which those qualifying for an ITC under

---

[1]    As originally enacted, Section 1603(j) required that all grant applications be filed before October 1, 2011, a date subsequently extended to October 1, 2012 by the Tax Relief, Unemployment Insurance Reauthorization, and Job Creation Act of 2010, H.R. 4853, 111th Cong. § 707(b) (2010).

IRC Section 48 could instead elect to receive the same economic benefit, but as an immediate cash grant, rather than as a tax credit.

31.    Section 1603 provides in relevant part:

(a)  IN GENERAL.—Upon application, the Secretary of the Treasury shall, subject to the requirements of this section, provide a grant to each person who places in service specified energy property to reimburse such person for a portion of the expense of such property as provided in subsection (b). . . .

(b)  GRANT AMOUNT.—

(1)  IN GENERAL.—The amount of the grant under subsection (a) with respect to any specified energy property shall be the applicable percentage of the basis of such property . . . [for wind projects, 30% of the basis]

(c)    TIME  FOR  PAYMENT  OF  GRANT.—The Secretary of the Treasury shall make payment of any grant under subsection (a) during the 60-day period beginning on the later of—(1) the date of the application for such grant, or (2) the date the specified energy property for which the grant is being made is placed in service.

(d)  SPECIFIED ENERGY PROPERTY.—For purposes of this section, the term ''specified energy property'' means any of the following:

[…]

(1)  QUALIFIED  FACILITIES—Any  qualified property . . . which is part of a qualified facility . . . described in paragraph (1) ["Wind facility"] . . . of section 45(d) of [the Internal Revenue] Code.

[…]

(h) DEFINITIONS.—Terms used in this section which are also used in section 45 or 48 of the Internal Revenue Code of 1986 shall have the same meaning for purposes of this section as when used in such section 45 or 48.

[...]

32.     Both wind energy developers and financial investors in good faith undertook massive, multi-million dollar investments predicated upon the availability of the Section 1603 cash grants.

33.     Section 1603's references to Internal Revenue Code Section 48 clearly indicate that Congress intended that the Section 1603 cash grant program be administered in essentially the same way as the ITC program.  For example, Section 1603(h) directs that terms used in both Section 1603 and Internal Revenue Code Section 48 shall have the same meaning; the language of Section 1603(d) extends its application to wind facilities by referring to "paragraph 1 . . . of the [Internal Revenue Code]," the section of that code defining wind energy.  If there were any doubt that Congress wanted the 1603 cash grant program to operate in the same way as the ITC, the Conference Report accompanying Section 1603 put it to rest, stating that "[i]t is intended that the grant provision *mimic* the operation of the credit under section 48 [of the IRC]."  Joint Committee On Taxation, General Explanation Of Tax Legislation Enacted In The 111th Congress at 109-110, JCS-2-11 NO 6 (I.R.S.), 2011 WL 940372 at *11 ("General Explanation") (emphasis added).

12

34. Congress's approach makes perfect sense, given that the ultimate financial effect of the ITC program and the cash grant, to both the Government and the wind entity, should be the same (assuming that the wind entity or those participating in it would have had income against which to make use of an ITC). In each case, the wind entity promptly receives a financial benefit equal to 30% of the cost basis of the wind energy facility.

35. The legislative history of Section 1603 further confirms that Congress intended that the Section 1603 program address and stimulate the development of wind projects in the same manner as would the ITC program, while overcoming the impediments to the use of ITCs created by the (hopefully temporary) economic downturn:

> The Congress understands that some investors in renewable energy projects have suffered economic losses that prevent them from benefitting from the renewable electricity production credit and the energy credit. The Congress further believes that this situation, combined with current economic conditions, has the potential to jeopardize investment in renewable energy facilities. The Congress therefore believes that, in the short term, allowing renewable energy developers to elect to receive direct grants in lieu of the renewable electricity production credit and the energy credit is necessary for the continued growth in this important industry.

General Explanation at * 11.

36. Certainty regarding the method of determining cost basis was critical. Under the terms of Section 1603, Congress directed that Treasury pay the cash

grant only after all financial arrangements with investors had been put into place, all expenditures on the facilities had been made, and the wind energy facility had been placed into service. Accordingly, investors needed to know, before committing to finance wind energy facilities costing in the hundreds of millions of dollars, exactly what the cash grant for those facilities would be.

37.    Section 1603(c) also required that Treasury's payments be expeditious, requiring that the Government "shall make payment" of a grant "during the 60-day period beginning on the later of (1) the date of the application for such grant, or (2) the date the specified energy property for which the grant is being made is placed in service." This expedited payment mechanism is critical to the Congressional intent of encouraging economic recovery, and was also necessary to "mimic" ITC rules, which allow a taxpayer to claim the ITC against its quarterly estimated tax payments to the Internal Revenue Service. The Internal Revenue Service would still have the authority to audit the award (as it does for the ITC) and insist that grant recipients report any excess grant as taxable income in the year the grant accrued. *See* AM 2011-004 (September 27, 2011).

38.    In Section 1603, Congress did not create a new administrative program. Congress did not set forth new criteria for the determination of cost basis of the receipt of benefits. Congress did not authorize rulemaking or otherwise allow agency discretion. Instead, Congress mandated that the Government provide

14

payments — promptly — based on well-known tax concepts that had been used for years by the very investors it hoped to incentivize.

39.     In short, companies in good faith entered into contracts and took the risks of building wind facilities in reliance upon receiving cash grants under the Section 1603 program in amounts equal to the tax benefits they would have received through ITCs.  Without such certainty, the risks would simply have been too great, especially during the recent economic downturn.

## V.     THE DETERMINATION OF "COST BASIS."

40.     As described above, Section 1603(a) entitles an owner of a wind energy project to a reimbursement payment equal to 30% of the owner's cost basis for federal income tax purposes in the portion of the facility that qualifies as "specified energy property."  Basis for federal income tax purposes is defined in the tax code as "cost" or "cost basis."  *See* 26 U.S.C. § 1012.  In the context of the Internal Revenue Code, when applied to a purchaser of property (such as the Plaintiffs here), these terms do not mean the actual "cost" to the seller of building a property.  Where both the buyer and seller are willing and well-informed participants in a sale transaction, the purchase price properly allocated to the "specified energy property" is determinative and establishes fair market value. Only in the rare case where the elements are not met would a further investigation

into purchase price be warranted, and in such a rare case, there are well-established rules for determining fair market value.

## VI.  TREASURY'S FAILURE TO AWARD THE FULL GRANTS MANDATED BY SECTION 1603.

41.    Consistent with Section 1603 and established practice, wind energy developers such as Terra-Gen and sophisticated investors, assisted by skilled advisors, engaged in carefully structured and negotiated transactions, resulting in agreements for the sale-leaseback of specific wind energy assets as to which Section 1603 applications were submitted.  Those applications recited the purchase price that the parties had negotiated, and as required by Treasury, were further supported by an independent appraisal, prepared by an expert, certified appraiser, which applied various valuation techniques for assessing the fair market value of the wind energy facility.  The eligible cost basis as set forth in the appraisal was confirmed by accounting firm KPMG. The applications appropriately sought cash grants equal to 30% of the cost basis.

42.    Instead of issuing the cash grants in compliance with Section 1603, Treasury improperly disregarded the rules, reduced grant payments, and undermined the economic assumptions under which industry participants obtained financing and developed and invested in renewable energy facilities.

43.    Section 1603 did not grant Treasury discretion in determining cost basis for the purpose of calculating cash grants.  Instead, Congress dictated that

ITC definitions would govern.  Indeed, Treasury's own guidance states that the "basis of property is determined in accordance with the general rules for determining the basis of property for federal income tax purposes." "Payments for Specified Energy Property in Lieu of Tax Credits under the American Recovery and Reinvestment Act of 2009," *available at* http: //www.treasurey.gov/initiatives/recovery/Documents/GUIDANCE.pdf.

44.    Treasury rejected Plaintiffs' determinations of cost basis, even though they were consistent with federal tax principles and supported by expert appraisals. Treasury substituted its own calculations of cost basis, which are incompatible with applicable tax rules and legal precedent.

45.    Section 1603 mandates that applicants with a wind facility that is already in service should be paid within sixty days of submitting the grant application.  But Treasury did not produce its (improper) recalculations of cost basis and grant amounts until long after that period expired.  Actual payments were delayed even further.

## VII.    TREASURY'S IMPROPER FAILURE TO PROVIDE PLAINTIFFS CASH GRANTS IN THE AMOUNTS FOR WHICH THEY HAD APPLIED.

46.    As a result of the foregoing and other violations of Section 1603, Plaintiffs have not been paid the cash grants to which they are entitled.

47.    Alta Wind II is a wind energy facility in the Tehachapi Pass, near Mojave, California, a region recognized for its significant wind resources. Alta II is composed of 50 Vestas V90-3.0 wind turbines, which together comprise 150 Megawatts of rated capacity, enough electricity to power 45,000 average American homes.

48.    In 2008, Terra-Gen acquired the existing rough building blocks of the Alta II project—the Master Power Purchase Agreement, some real estate rights and options, wind data, and preliminary surveys. Over the next two years, Terra-Gen invested hundreds of millions of dollars in developing Alta II into a viable wind energy facility. The project went into service on December 30, 2010.

49.    On the same day it went into service, Terra-Gen sold the portion of the Alta II Project that constituted grant eligible property (the "Alta II Facility") to the five Alta Wind II Owner Lessors in an arm's length sale-leaseback transaction, for a total price of $440,249,840. Plaintiffs Owner Lessor A and Owner Lessor B each purchased 25% shares; Plaintiff Owner Lessor C purchased a 20% share; and Plaintiffs Owner Lessor D and Owner Lessor E each purchased 15% shares in the Alta II Facility.

50.    The Alta II Facility is comprised entirely of "specified energy property," and thus fully eligible for cash grants under Section 1603. Each Plaintiff submitted a separate application for a 1603 grant to Treasury over a three

18

day period from January 14, 2011 to January 17, 2011. Because Plaintiffs Owner Lessor A and Owner Lessor B each own 25% of Alta II, each reported a qualified cost basis of $110,062,460 (one quarter of the $440,249,840 total price), and applied for a $33,018,738 cash grant, representing 30% of that cost basis. Plaintiff Owner Lessor C, which owns 20% of Alta II, reported a qualified cost basis of $88,049,968 (20% of the total price), and applied for a $26,414,990 cash grant. Plaintiffs Owner Lessor D and Owner Lessor E, which each own 15% of Alta II, each reported a qualified cost basis of $66,037,476 (15% of the total price), and requested grants of $19,811,242.

51.    While the cost basis derived from the purchase price should itself be dispositive, in support of their applications, and as required by Treasury, Plaintiffs each provided a copy of an appraisal of Alta II performed by DAI Management Consultants. DAI certified that its appraisal conformed to the Uniform Standards of Professional Appraisal Practice as recognized by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989.

52.    In preparing the appraisal, DAI reviewed current market, economic, and regulatory conditions for the region in which Alta II operates. It also examined numerous acquisition due diligence materials, including Terra-Gen's Project Financial Model, the Generating Facility Power Purchase and Sale Agreement, the Independent Engineer's Technical Due Diligence Report, a wind

consultant's Assessment of the Energy Production of Alta II and related wind projects, a Tehachapi Deliverability Analysis prepared by Z-Global Engineering and Energy Solutions, and the Facility Lease Agreement.

53.   DAI appraised Alta II's value in accordance with the three valuation methods normally applied by the IRS for the determination of cost basis (in addition to the purchase price itself): the cost approach, the income capitalization approach, and the sales comparison approach.

54.   Under the cost approach, DAI considered how much it would cost to reproduce Alta II.  DAI determined that an estimate of the cost of reproduction should properly account for construction costs, as well as a turn-key premium to reflect the successful construction and delivery of a fully operational plant, and a developer premium to reflect a reasonable return on the capital Terra-Gen placed at risk during the construction process.  DAI determined that the cost of the Alta II Facility was approximately $440.7 million.

55.   Under the income capitalization approach, DAI analyzed the expected discounted present value of Alta II's cash flows, including operating income and expenses, as well as tax-based income and payments.  It determined that the discounted present value of the Alta II Facility is approximately $439.8 million.

56.   DAI determined that there were no facilities sold that were sufficiently comparable to include for valuation purposes.

57.   Taking all of these valuations into consideration, DAI concluded that the fair market value (FMV) of the Alta II Facility as of the closing date was within a range of $439.8 million and $440.7 million, a range fully consonant with the purchase price of a little over $440.2 million.

58.   At the time of the applications, Plaintiffs, in fulfillment of their responsibilities as trusts, retained one of the "Big Four" accounting firms, KPMG, to perform an independent examination whether the eligible cost basis each Plaintiff asserted in its application to Treasury was correct.   After a careful examination, KPMG issued an attestation report concluding that the eligible cost basis for Alta II "ha[d] been determined in accordance with the general rules for determining the basis of property for federal income tax purposes."

59.   In February 2011, Treasury informed Plaintiffs that it believed Alta II's asserted cost was "far above market expectations," and asked for more material substantiating the cost.   Treasury did not offer any support for its belief, which as noted was contradicted by the valuations of two independent appraisers.

60.   Plaintiffs promptly responded, providing all the requested materials, but reminding Treasury that the cash grant should be calculated using cost basis as determined through federal income tax rules, which specify that an owner's basis is its purchase price.   Plaintiffs reiterated the findings of the independent appraisers corroborating that the purchase price reflected the fair market value, and noted

that, since the appraisals, the passage of the "Small Business Act," which made Alta II eligible for a 50% bonus depreciation tax incentive, had further increased Alta II's value. Plaintiffs also explained that Treasury's concerns about Alta II's cost in comparison to market expectations were unfounded because Alta II's cost was fully justified by, among other things, its unique location and wind capacity, the difficult and expensive construction process, and the complicated regulatory and permitting environment the developer had been forced to navigate.

61. On March 9, 2011, with the 60-day statutory deadline for grant awards fast approaching, Treasury asked for even more information about the costs associated with Alta II. Plaintiffs again promptly replied, providing Treasury a breakdown of Terra-Gen's development costs, certified by KPMG. Plaintiffs cautioned, however, that a seller's out of pocket development costs alone were not an appropriate indicator of a *purchaser*'s cost basis in a property. Plaintiffs once more reminded Treasury that under established IRS procedures, cost basis is determined by the purchase price, when that price is equal to the property's fair market value. Plaintiffs also informed Treasury that, in addition to the ample evidence already before the agency, Alta II's price could be further substantiated by the competitive bids that had been offered for Alta Wind I, a very similar wind facility adjacent to Alta Wind II. Those bids, not publicly available at the time of

independent appraisals and thus not used in DAI's report, were completely in line with the price Plaintiffs paid for Alta II.

62.     Despite this voluminous evidence in support of the qualified cost basis asserted by the Plaintiffs in their 1603 applications, Treasury informed Plaintiffs on September 8, 2011—almost 8 full months after the applications had been submitted, and thus long after the 60 days deadline for payment specified by Section 1603—that it was awarding cash grants for the Alta II facility using a cost basis much lower than that submitted by the applicants.  Rather than awarding the grant based on the cost basis established by the *purchaser's* price and substantiated by expert valuations, Treasury decided to use as the cost basis the *developer*'s out of pocket costs in constructing Alta II.  Thus, while Plaintiffs applied for Section 1603 grants totaling $132,074,950 based on a qualified cost basis of $440,249,840, Treasury awarded Plaintiffs $91,166,484 based on a cost basis of $303,888,280.

63.     Specifically, Plaintiffs Owner Lessor A and Owner Lessor B were each awarded grants of $22,791,621 instead of the $33,018,738 grants each had requested.  Plaintiff Owner Lessor C was awarded $18,233,297 instead of the $26,414,990 grant it had requested, and Plaintiffs Owner Lessor D and Owner Lessor E were each awarded $13,674,973 instead of the $19,811,242 grants each had requested.

64.    Despite the fact that Congress specifically mandated that the cash grants should be administered to "mimic" ITCs, Treasury's reduced cost basis calculation was wildly out of step with applicable rules for determining cost basis for federal income tax purposes, including ITCs.

65.    The explanation Treasury provided for its reduced cost basis figure demonstrates that the agency violated Section 1603 by failing to follow basic tax code principles for the calculation of cost basis.  The following are only a few examples of the numerous defects in Treasury's analysis, all of which resulted in lower cash grants than those to which Plaintiffs are entitled:

66.    First, Treasury ignored the fundamental rule for establishing cost basis: where both the buyer and seller are willing and well-informed participants in a sale transaction, the purchase price is determinative and establishes fair market value.

67.    Second, in asserting the amount requested was out of step with "open market expectations," Treasury contradicted the valuations of two independent appraisers that applied IRS approved valuation approaches.  Further, Treasury did not even reference the ample additional evidence, provided by Plaintiffs at Treasury's request, that demonstrated that the purchase price represented the property's fair market value.

68.    Third, Treasury stated that it adjusted the cost basis "to reflect the basis certified by KPMG and Terra-Gen in the pre-sale/leaseback Independent Auditor's Report and Report of Management" because that amount is allegedly "more consistent with market expectations." This flies in the face of common sense. The figure Treasury used represented Terra-Gen's out of pocket costs in developing Alta II. It is ridiculous to suggest that the market would expect a developer to sell a property for zero profit, as Treasury's statement implies.

69.    Fourth, as Plaintiffs cautioned when they provided Terra-Gen's development cost data to Treasury, using it in isolation to establish cost basis is inconsistent with general federal income tax rules. It is well established in tax law that the fair market value of a property includes not only the construction costs, but also a turnkey fee, and a developer's premium. Among other deficiencies, the figure Treasury used, because it represented only Terra-Gen's out of pocket costs, did not include either of those items.

70.    Treasury has made clear that its cash grant awards to Plaintiffs are final.

## CLAIM FOR RELIEF

### COUNT ONE
**(Violations of Section 1603, Statutory Mandates and Statutory Authority)**

71.    Plaintiffs re-allege and incorporate ¶¶ 1-70 of the Complaint as if set forth fully herein.

72.     Section 1603 of the Recovery Act requires the Government to make payments based on the statute's plain language and the statute's mandates, and to make those payments pursuant to the statute's direction that Treasury follow applicable U.S. tax code, rules and principles.

73.     Section 1603(h) appropriates "such sums as may be necessary to carry out this section."

74.     Section 1603 further requires that the payments must be determined according to specific criteria set forth in the statute, the Internal Revenue Code and tax rules and principles.

75.     Plaintiffs are qualified applicants under Section 1603.

76.     Plaintiffs have submitted applications to the Government in conformity with the terms of Section 1603.

77.     The Government failed to provide timely and complete cash grants to Plaintiffs, in violation of Section 1603.

78.     The Government's violations directly caused substantial damage to Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask this Court to enter judgment in their favor and against Defendant and to:

A.     Award each of the Plaintiffs monetary relief equal to the difference between the amount it received pursuant to its Section 1603 application and the amount it should have received;

B.     Award each Plaintiff such additional monetary relief as is available under applicable law; and

C.     Award each Plaintiff such other and further relief as this Court may deem necessary and proper.

Respectfully submitted,

Steven J. Rosenbaum
*Counsel of Record*
(srosenbaum@cov.com)
Dennis B. Auerbach
(dauerbach@cov.com)
Thomas R. Brugato
(tbrugato@cov.com)
Covington & Burling LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20044
(202) 662-5568
(202) 778-5568 fax

November 21, 2013                        *Counsel for Plaintiffs*